Docket Number 131568, Roche Vitamins v. United States, Dr. McCarthy, whenever you're ready. Good morning. Thank you. May it please the Court. The trial court below erred fundamentally by applying the statutory chapter note language and the explanatory note language to the Beta Teb 20% product rather than to the raw beta-kerosene-crystalline material. And when one looks at the statutory language as applied to the raw beta-kerosene-crystalline material, it's clear that Beta Teb 20% could not possibly be classified under Chapter 29. So, I mean, I understand your argument that the Court of International Trade applied the wrong standard, and it seems to me that you have a significant argument in that respect. But my problem is that looking through the interpretation, I have difficulty in seeing what the evidence is that supports a finding that this is particularly suitable for tabulating. The addition of a stabilizer makes it particularly suitable for tabulating. I find testimony that the potency makes it particularly suitable for tabulating, but I don't see testimony that the stabilizer addition makes it particularly suitable for tabulating. Could you show me where in the record there is any such testimony? Well, I think the specific, just to back up a little bit, one of the specific use that we're talking about here is for use as a provitamin or dietary supplement, and it's particularly suitable for tabulating. Yeah, but you're not answering my question. Try to answer my question. Where in the record is there testimony that the addition of the stabilizer makes it particularly suitable for tabulating? Well, I could draw Your Honor's attention to page, Joint Appendix page 22, transcript page 291, where... Hold on, hold on. Okay, I'm sorry. Joint Appendix 22, okay. Yeah. So, quoting transcript page 291, and this is a trial court finding, where the trial court said the merchandise was developed by Roche specifically, and again, this is a term chosen, this is an adverb chosen by the trial court, specifically, quote, for use in high potency and antioxidative vitamin tablets. And so, I want to, and I... But that's not testimony that the addition of the stabilizer makes it particularly suitable for tabulating, which is your argument. And I looked through the testimony, and I asked my clerk to look through the testimony. I'm not seeing any testimony that supports that notion. I mean, you may be right about the legal test that was applied by the CIT being too stringent, and that's not a bad argument, but I don't see the factual foundation for what you're arguing. And the CIT opinion seems to be somewhat conflicting, in one place saying, well, it's the potency that makes it particularly suitable for tabulating, and the next page seems to suggest maybe somehow that the stabilizer makes it particularly suitable for tabulating. But I can't find the evidence that supports your theory. Where is it? The specific use, Your Honor, we did use the term tabulating enough, but that's a more The specific use is for tabulating and the use of the vitamin or dietary supplement, including in the form, because that's what, Roche's customers buy the BetaTab 20% and turn it into vitamin tablets. Tableting is a more narrow specific use than what we're talking about. We're saying that the specific use is for, is as a nutritional and dietary supplement as opposed to the coloring. Where is the testimony that the addition of the stabilizer makes it particularly suitable for a particular use? I didn't see that in there. And it seems a bit counterintuitive because all uses would seem to require some sort of stabilizer. But you've got good arguments about the legal theory, but I don't see the factual support for what you're saying. Because all of the, the BetaTab 20% is only 20% by weight beta carotene crystal material. Everything that's added to it, including another pro vitamin to cope for all, that, all of that is used to make it more suitable. All of those are treated by the trial court and by Roche as stabilizers. Where's the testimony? Where's the testimony? Where's the testimony that the addition of the stabilizer makes it particularly suitable for tabulating or some other use? I think by definition, Your Honor, that all of the findings by the trial court that we have identified on pages, I could start on page 21, where the trial court found this fact, and this is stipulated fact on page 21, BetaTab was developed for use in vitamin products and actually used during the relevant time period was predominantly the source of pro vitamin A for products. Everything by definition, according to the trial court, is a stabilizer. Anything that I don't think you're answering the question, but I guess I have to assume that there isn't any such testimony. Well, the high concentration, turning, Your Honor, to page 22, again, there's a finding citing transcript pages 704 to 707, a high concentration and high bioavailability of beta carotene in the merchandise makes it preferable for use in dietary supplement tablets. So, by definition, all the stabilizers were added, but just to back up about why this could not possibly go into Chapter 29, the raw beta carotene crystalline material, Roche stipulated, as a matter of fact, before trial, doesn't need any stabilizers that are necessary for its preservation or transport. In paragraph 40, which is in Joint Appendix page 88, beta carotene crystalline can simply be stored in a cool container and transported. It doesn't need any stabilizers. So the addition of the stabilizers, any stabilizers, is barred by the Chapter Note 1F, which says that the only stabilizers that can be added to permit classification under Chapter 29 have to be necessary for the preservation and transport. I'm just wondering, looking back at the Court of International Trade opinion, I can't recall where the district court judge discussed that argument. It's confusing, Your Honor, and that's not our principal argument, but I'm trying to identify the error, which is focusing on the beta type 20% rather than on the raw chemical. But that's a very specific legal argument you're making now, which is that that portion which says that it has to be used for transporting or whatever is not used. Is that an argument you made to the CIT? It is an argument that we made in response to the summary judgment motion, and it's footnote 11. You didn't raise it in your opening brief here? We did not raise it. I'm not raising it as an argument, because the reason why we're here is because we want correction of the trial court's misinterpretation of specific use and equating it with extraordinary use, as Roche is ordering, to equate specific use with exclusive use. So why don't you point us to what the Court of International Trade said, where the legal error is, where his analysis or his discussion of that which you're saying is problematic. The specific use? Yeah. The specific use, the definition, the error is when Judge Eaton described specific use as extraordinary use or as a use not common to the, he cited this court, the only citation for it was this court's decision in Degusa, where he described the specific use as requiring a use that's extraordinary or outside the common use of the chemical heading. And that's the error that we're saying. That is certainly not what Judge Wallach held in denying summary judgment. Judge Wallach said that should the evidence at trial establish that this was, that the data had... Did he use the term extraordinary use? I'm not finding... Extraordinary use. I'm sorry, Your Honor. I'm looking at his discussion of CC's citation to Degusa. Joint Appendix, page 18. Judge Eaton wrote, merchandise that might otherwise be classified under the headings chapter 29 becomes particularly suitable for specific use and thus is excluded from those headings when, one, the ingredients added to it facilitate uses not ordinary to the chemicals, reactive properties in a manner that excludes uses ordinary to the goods of the heading. And he cites this court's decision in Degusa for that. And that is, and he goes on to elaborate that the product's increased suitability for an ordinary, he emphasizes ordinary application of its chemical component will not exclude it from chapter 29 so long as the product can still be used as that chemical in the other ordinary way. And this is the error that we're saying is that the addition of stabilizers does not have to transform the chemical to something that is not ordinary use. Beta-carotene has multiple general uses. It can be used as a colorant, and after, and that, which was Roche's principal argument and is not appealing here. And the trial court stated, it was demonstrated as a matter of fact, trials, that the additional non-beta-carotene ingredients added as stabilizers do not make the merchandise particularly suitable for specific use. Right, and that's what we're saying that the error is. We're saying that, your Honor is quite correctly describing the fact that we're of course contending that that definition of specific use is injected with legal error, which is equating a specific use with an extraordinary use, or a use that's not common to the hadith. And that is certainly, we don't, we've read this court's decision in Degussa numerous times, there's nothing in the language of Degussa. Can we look at the language which, I mean, what you're relying on and what he cites in the explanatory note? Yes. And that language does not alter the character of the basic product and render it particularly suitable for specific use rather than general use. Yes. Can you explain to me just how what the CIT judge said was different in intention with this? He was saying that beta-tabbed use as a product after processing into beadlets and particles, that use as a particle, as a product for a dietary, a vitamin or dietary supplement is not a specific use. Well, no, the problem is that he says that the addition has to exclude its being able to be used for general use. That's the problem. Right. On its face, it does, the provision doesn't seem to require that it makes it unsuitable for general use. It just requires that it may be made particularly suitable for a specific use. Right. And the court may disagree, but we think that he made numerous findings. In fact, he found in order to find, just to back up, Roche principally argued that it should be categorized as a colorant. Beta-carotene under a specific exclusion in the explanatory note, 29.366, does not allow beta-carotene to be classified in Chapter 29 because of its use as a colorant. Now, it can't be this product, again, looking at the raw beta-carotene rather than the product, this product can't be classified under Chapter 29 period because it has beta-carotene, and beta-carotene by definition can't be classified under 29. We don't think that 29, which is why we've been arguing this below and we're not arguing this now, 29.366 doesn't really apply to this product because it's not really a colorant. In fact, Judge Eaton made numerous correct findings that this is not principally used as a colorant. It's principally used as a beta, it's specifically used, and Judge Eaton himself used the word adverb specifically, it's specifically used as a vitamin and dietary supplement. It is a preparation. In fact, Judge Eaton quoted this court's language in, we should have questions about that, as a food preparation. Judge Eaton himself quoted this court's language in Orlando, saying a food preparation is inherently something that is prepared for a specific use. What are some examples of things that are excluded by this language? I'm not talking about this case, but you seem to think that it has broader significance. What are examples of the kinds of products that are excluded by the language that we're talking about here? Well, I think that looking at the explanatory note, and we've set up the explanatory note. No, I'm not asking about the explanatory note, which I understand, I know what it says. Right. I'm asking about, give us some examples of the kinds of specific products that become unsuitable or particularly suitable for a specific use because of the addition of a stabilizer. What are we talking about here? Well, I'm pretty sure that my science background is not enough to give you specific products. I can tell you that there's a number of products that are listed in the explanatory notes that do fall within, and then what the exclusions to Chapter 29 make clear is that any sort of processing that takes the raw chemical, again, we're talking about beta-carotene crystalline, which can't be under 29 anyway, but assuming for argument's sake that it could be, adding stabilizers that are simply necessary for the preservation of transport. It's very limited processing. And that once you've taken a single raw chemical, organic chemical, and you've added stabilizers for any other reasons, then that takes it out. But there's a bunch of products that are listed in the explanatory notes, 341, 342. But they list the stabilizers, they don't list the products, right? They list the type of vitamins that could be classified under 29 in their derivative. And it goes on, the explanatory note starts at page 335 and goes on and lists... Maybe I misunderstood, or I'm not recalling. I thought in the government's brief it cited some number of however many millions of dollars this is going to cost in terms of the result, in terms of the consequences this is going to have. Well, why can't you answer Judge Dyke's question then? I mean, presumably the government has thought about and thinks that this rule created by the CIT is going to affect numerous cases. What are some of the... Oh, all of the cases we cited, yes, there's concern. I'm sorry, I misunderstood your honest question. Oh, I may have misunderstood. No, the reason, the concern we have is this interpretation of the specific use, which basically makes it inoperative because it requires that the addition of stabilizers Well, what are some examples of products that would be affected by this interpretation other than the one we're dealing with here? We have cited a number of products in our statement of related cases that concern the addition of stabilizers that we think have rendered products for specific use. And also in Chapter 28, I mean, arguably, the outcome of DGUSA might have been different because the surface modification that occurred in DGUSA, which is under Chapter 28, which also was a... Okay, wait, wait, wait. You've got numbers. Statement of related cases, a lot of numbers. Those numbers don't tell me anything. What kind of products are we talking about? What's involved in those cases? A number of different beta-carotene products. But I guess, not just for the cases that we already have, but also just looking forward, we're just concerned that this is now, that Chapter 29 is intended to be very limited to cover raw chemical compounds with very limited additions, only for purposes of preservation and transport. And now this is going to include any sort of additions that can be used for any use that's common to the category. That means that nothing would be excluded. You know, it'd be hard to imagine. And I think maybe it's easy to do it this way. We put it on broach to identify what kind of specific use would be, could be found under this, under the trial court's definition. Otherwise, if we're talking about something that is so extraordinary, then the chapter heading wouldn't even come into, wouldn't be relevant under anything. I think we're way over our time. No, we've had questions. But we'll restore a minute of rebuttal and when we hear from you, we'll decide. May I please support, Your Honors? So what kind of products would be excluded under the CIT's definition? Yeah, it's very simple. You could take a product like a beta-carotene powder or a vitamin A powder that has stabilizers and you could add a mineral in, because the customer wants a mineral. A mineral what? A mineral. Zinc, whatever, magnesium, whatever it may be. Is that a stabilizer? No, it would not be a stabilizer. Well, then the provision isn't implicated at all. Because the provision talks about the addition of a stabilizer, which renders it particularly suitable. Give me an example under the trial court's construction where the addition of a stabilizer would exclude a product. Well, Your Honor, if the additional ingredient, the note speaks to additional ingredients to be used as stabilizers. If you are adding ingredients that are being used as stabilizers and they are not altering the product in some material way, then it remains classified there. If you add ingredients that are not necessary for stabilization, then it would remove... So you are unable to identify any product that would be excluded under the trial court's construction? You know, I can't... The ingredients that get used as stabilizers are common ingredients like gelatin and sucrose or matters like that. If you put tricalcium phosphate in the product because it's needed to help the product form better for tableting, that would be an example where a product would be excluded because it has an ingredient that is being used for a specific end application. But that's not a stabilizer, right? I suppose that the manufacturer may characterize as that, but I don't believe that it would be so. Let's talk about the record here. You heard my questions about what makes this particularly suitable for tableting. I see testimony that the potency makes it particularly suitable for tableting, presumably because you then don't end up with a horse-sized pill, right? Is there testimony in the record that the addition of the stabilizer makes it particularly suitable for tableting? There is none whatsoever. In fact, the testimony was conclusively just the opposite, that the ingredients are the very basic stabilizing ingredients that are used to stabilize vitamins and provitamins for a broad range of uses. They're the very stabilizing ingredients that are mentioned in the explanatory notes. And there was expert testimony that said they are neither intended to have any effect on tableting, they have no effect on tableting, and they're present as basic stabilizers that are used for the product for a broad range of uses. And the product was used for a broad range of uses. It was used in tablets. A number of pharmaceutical companies purchased this product. It actually got used in some pet food products. It was actually used in conventional foods. It retains the character of a general use vitamin, provitamin. The intent behind 2936. So your theory is that you win even under the government's construction of the provision? Yes. Yes. The Judge Wallach and what we call Rochon followed the explanatory note, and he said to worry. The government had raised a triangle issue on summary judgment. They raised a triangle issue about the functionality of the ingredients. It was established that they were added as stabilizers. That was beyond dispute, and it was also established as a matter of fact that they were present in amounts necessary for preservation and stabilization, and not any more than that. That was established in fact in Rochon, and was reaffirmed in Rochon 3. What the Judge said in Rochon is the government raised an argument that the gelatin and the sucrose have some exceptional properties that take it beyond stabilization, and they make the product particularly suited for tableting. In fact, if you read in the Rochon decision, and I can bring you to the page, they even went so far as to argue that the sucrose made the beta tab powder uniquely suited for tableting. Is there any such testimony? That was the argument that was raised, but during trial, no, there was absolutely no testimony. The only testimony on the record was that the sucrose and the gelatin were neither intended to affect tableting, nor would they have any effect on tableting. I think it's significant to note that this beta carotene powder, this 20% powder, cannot be made directly into a tablet. It has to be combined with tableting excipients. This beta carotene 20% powder is exactly what the drafters intended to put in 2936 because it has the properties of a general use vitamin and pro vitamin. True, marketed to the industry that wants the highest potency powder, but we need to keep in mind when Judge Eaton made his comment about, pardon me, let me just quote it directly so I don't misspeak. He said a product's increased suitability for an ordinary application. That is the phrase that has the government most trouble, and I understand. But in the context of this case, the judge was responding to the assertions made by the government that because the product was developed to create a higher potency, therefore, it's been somehow altered for a specific use. This trial was all about establishing the science. So maybe the CIT went a little far in the test that it formulated? Well, I would say that if we do have this sentence on page A18 where it says, thus a product's increased suitability for an ordinary application if it's a chemical component will not exclude it from Chapter 29 so long as the product can still be used as that chemical in other ordinary ways. They'd probably just redline that sentence out and it wouldn't change opinion at all. And I think that would alleviate the government's concerns that this opinion could be read too broadly. So you sort of agree that maybe it went too far? Well, I think the judge could have said it a little differently. But we have to understand that when the judge referred to the increased suitability, he was talking about the development, taking an industry which was largely walking off at 10% strength pro-vitamin powder, and they were able to get it to 20%. What they did is they actually reduced the amount of stabilizers necessary for the product and it obviously had a higher demand for companies that want to have the high potency like a tablet or a capsule, but it's used in a broad range of uses. It's a very popular product and it is exactly the type of product that Congress intended duty-free. They want duty-free treatment for vitamins and pro-vitamins. What Congress doesn't want is for people to be able to manipulate a product, if you will, for a particular range of use, they want to keep 29, 36 for general use vitamins and pro-vitamins and that's exactly what it is. And I think if the company had called this product simply beta-carotene 20%, we might not even be here today. But they called it beta-tab in order to drive marketing and that's why we're here today. Do you have any information about all these cases listed under the statement of related cases, the kind of products you're dealing with and all the numbers that we see? Roche Vitamins and a successor company, if you will, DSM Nutritional Products, which purchased the Roche Vitamins business. Within that list of cases, there is the beta-tab 20 product. What else is there? There are some other products that are mixed in there that are various carotenoid products, but in light of the trial court's decision that a carotenoid that is marketed for use in the nutrition field cannot be classified as 3204, I don't believe that a large number of these cases will not be impacted whatsoever by the outcome of this decision. Well, then I do have a few more minutes and I will simply... You don't have to use them. I don't have to use them? Well, I suppose that I don't know. There were a number of contentions made in the government's reply brief. I think this argument that if you can ship a raw chemical under a nitrogen purge temporarily that therefore you'll never have a stabilized vitamin is, well, I disagree and I'll just say it at that. It was not an argument raised below. It was a little bit of a surprise to see it in a reply brief. I think that's been addressed by the court. You know, the contention that beta-carotene crystalline has uses in and of itself really is not a fair statement. It has to be stabilized first. So beta-carotene crystalline is used to make a stabilized product. And I guess I don't really need to say anything more. Oh, the contention that under the court's reading even manufacturing a tablet would not be a specific use under the explanatory note for Note 1F I don't think is a fair characterization of the trial court opinion. I have no doubt that if Judge Eaton were given a fact pattern where the product had a tableting excipient, for example, in it, he would have kicked us out of 29-36 in two seconds. So a tablet would not be classifiable in 29-36 under any reading of this case. And obviously the question about shipping under a nitrogen purge, Note 1F states that products may be stabilized for preservation or transport, one or the other. In this case, the preservation is for the commercial preservation of the product, so it can be shelf-stable. It can be used by the end customers to produce whatever products that they're making. And obviously the explanatory contemplates the very stabilizers here. I disagree with the government's argument on that point, and I think we've hit everything. If you have any more questions, I'm happy to answer them. Thank you. Briefly, I think Mr. Smith, first of all, you mentioned the issue about the necessary preservation and transport language and I reply briefly because Mr. Smith's vice-mayor has repeated the error of the trial court, which is that these stabilizers are added to preserve the product, which is a processed form of beta-carotene. Again, by definition, one must apply the statutory and explanatory language to the raw chemicals because if we're going to apply it to the product, which is a mixture of two pro-vitamins, tocopherol, vitamin A and vitamin E, then they're automatically out of Chapter 29. Again, we, and Your Honor, the only other thing, because you're being generous by giving me any rebuttal, I would draw Your Honor's attention to Joint Appendix pages 179 and 189, specifically the trial testimony at pages 222 and 223 of the transcript, and 247 and 248. Those specifically talk about how the additional agents were added of plasticizers and agreement that provides more elasticity to the film to make it more suitable for tableting. These were stabilizers that were not added to preserve or transport the raw beta-carotene product. They were added to make, perhaps, and we stipulated below, to a processed form. But if we're talking about the processed form, then they're automatically out of Chapter 29 because... So where's your best testimony that the addition of the stabilizer made it particularly suitable for tableting? Your Honor, Joint Appendix pages 179, which is, the transcript page is 223. We have a manuscript. 179. Right, 179, pages 222 and 223. It's talking about the use, about the combination of the right amount of gelatin, in this case, porcine gelatin, and the right amount of sucrose makes it suitable for dietary supplements. On page 223, they talk about the combination of the right amount of gelatin and the right strength of gelatin, and the plasticizer are affecting the parameters, which are named as extrusioners. This contributes to tabling. Again, there's more discussion. But I don't see that that's saying that it made it particularly suitable for tabling. Because these stabilizers are not to allow the transportation, the preservation and transport of the beta-carotene. He said you abandoned that argument in your opening brief. Do you agree? Well, I think that it contributes to the trial court's error on the misplaced focus of applying the statutory language and the explanatory net language to a processed form of the raw chemical, which is erroneous as a matter of law. Because otherwise it doesn't make any sense. It just really doesn't make any sense. And beta-carotene, again, is not even allowed in Chapter 29 under 29.366. It's not even allowed because of its use as a colorant. Here, it's not used as a colorant. It's principally used as a nutritional and dietary supplement, which is a specific use of the raw chemical. Thank you very much. That temporarily concludes this proceeding, but we'll recess and come back. All rise.